Gina M. Serra, SBN 361172
**RIGRODSKY LAW, P.A.**
1091 N. Palm Canyon Drive, Suite 9
Palm Springs, CA 92262
Telephone: (760) 406-5746
Facsimile: (302) 654-7530
Email: gms@rl-legal.com

*Attorneys for Plaintiff*

*[Additional Counsel on Signature Page]*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

LOIS B. POHLMANN, Derivatively on Behalf of Nominal Defendant CYTOKINETICS, INCORPORATED,

Plaintiff,

v.

ROBERT I. BLUM, MUNA BHANJI, SANTO J. COSTA, ROBERT A. HARRINGTON, JOHN T. HENDERSON, EDWARD M. KAYE, ROBERT LANDRY, B. LYNNE PARSHALL, SANDFORD D. SMITH, WENDELL WIERENGA, and NANCY J. WYSENSKI,

Defendants,

and

CYTOKINETICS, INCORPORATED,

Nominal Defendant.

Case No. _______________

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

**DEMAND FOR JURY TRIAL**

**<u>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT</u>**

Plaintiff Lois B. Pohlmann ("Plaintiff"), by and through her undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant Cytokinetics, Incorporated ("Cytokinetics" or the "Company"), against current and former members of the Company's Board of Directors (the "Board") and certain of its executive officers seeking to remedy the Individual Defendants' (defined below) breaches of fiduciary duties and violations of federal law. Plaintiff

alleges the following based upon personal knowledge as to herself and her own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things: a review of Defendants' publicly available documents; conference call transcripts and announcements made by Defendants; filings with the United States Securities and Exchange Commission ("SEC"); press releases published by and regarding Cytokinetics; legal filings; news reports; securities analysts' reports about the Company; filings in the securities class action captioned *Seidman v. Cytokinetics, Inc., et al.*, Case No. 3:25-cv-07923-RFL (N.D. Cal.) (the "Securities Class Action"); and other publicly available information.

## NATURE OF THE ACTION

1. This is a shareholder derivative action brought by Plaintiff on behalf of Cytokinetics against certain of its officers and members of the Company's Board (the "Individual Defendants")[1] for breaches of their fiduciary duties between at least December 27, 2023, and May 6, 2025, inclusive (the "Relevant Period"), and violations of federal securities laws, as set forth below.

2. Cytokinetics is a biopharmaceutical company with a lead drug candidate called aficamten. Aficamten is a cardiac myosin inhibitor which is intended to treat obstructive hypertrophic cardiomyopathy ("oHCM").

3. During the Relevant Period, Cytokinetics sought regulatory approval from the U.S. Food and Drug Administration ("FDA") to market aficamten in the United States following Phase 3 clinical trials of the drug. To acquire such approval, the Company submitted a New Drug Application ("NDA") to the FDA. Throughout the Relevant Period, the Individual Defendants assured shareholders that the Company expected FDA approval of its aficamten NDA in the

---

[1] Individual Defendants are Robert I. Blum ("Blum"), Muna Bhanji ("Bhanji"), Santo J. Costa ("Costa"), Robert A. Harrington ("Harrington"), John T. Henderson ("Henderson"), Edward M. Kaye ("Kaye"), Robert Landry ("Landry"), B. Lynne Parshall ("Parshall"), Sandford D. Smith ("Smith"), Wendell Wierenga ("Wierenga"), and Nancy J. Wysenski ("Wysenski"). The Individual Defendants, together with Cytokinetics, are "Defendants."

second half of 2025, based on the Prescription Drug User Fee Act ("PDUFA") action date of September 26, 2025. However, the Individual Defendants failed to disclose the material risks related to the Company's failure to submit a Risk Evaluation and Mitigation Strategy ("REMS") which could delay the FDA's regulatory review of the NDA.

4. Defendants repeatedly affirmed and touted the Company's progress towards the regulatory approval and commercial readiness of aficamten throughout the Relevant Period. However, in reality, the Individual Defendants concealed the deficiencies and issues with the aficamten NDA, including, but not limited to, the omission of the REMS from the initial aficamten NDA.

5. The truth began to be revealed on March 10, 2025, when the Company announced that the FDA had decided not to convene an advisory committee to review the Company's aficamten NDA. Later, on May 1, 2025, Cytokinetics published a press release titled "Cytokinetics Announces New PDUFA Date for Aficamten in Obstructive Hypertrophic Cardiomyopathy" (the "May 2025 Press Release"). In the May 2025 Press Release, the Company announced that the FDA had extended the PDUFA action date for the aficamten NDA from September 26, 2025, to December 26, 2025, to review the REMS information the FDA had requested from the Company after it had already submitted its initial NDA. The May 2025 Press Release also revealed for the first time that the Company had not included REMS in its initial aficamten NDA filing, despite previous discussions with the FDA about safety and risk mitigation, and that the subsequent REMS submission by the Company constituted a major amendment to the aficamten NDA, necessitating a three-month extension of the PDUFA action date.

6. On this news, the Company's stock price declined $5.57 per share, or approximately 13%, to close at $37.35 per share on May 2, 2025.

7. The truth was fully revealed on May 6, 2025, when Cytokinetics hosted an earnings call to discuss its financial results for the first quarter of fiscal year 2025 (the "1Q25 Earnings Call"). During the 1Q25 Earnings Call, Defendant Blum admitted that the Company had

multiple pre-NDA meetings with the FDA discussing safety monitoring and risk mitigation, yet the Company chose to submit its aficamten NDA without REMS, relying on labeling and voluntary education materials.

8. On this news, the Company's stock price declined $0.93 per share, or approximately 2.7%, to close at $33.04 per share on May 7, 2025.

9. As set forth herein, throughout the Relevant Period, the Individual Defendants breached their fiduciary duties by issuing, causing the issuance of, and/or failing to correct the materially false and/or misleading statements and omissions of material facts to the investing public concerning the Company's business, operations, and prospects. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (i) the Company had not completely and properly submitted its aficamten NDA to the FDA; (ii) the Company had chosen to omit REMS from the initial aficamten NDA despite prior discussions with the FDA about safety and risk mitigation; (iii) a subsequent REMS submission would necessitate a delay in the FDA's review of the aficamten NDA; (iv) delays in FDA approval would drive uncertainty in the REMS; (v) the Company failed to maintain adequate internal controls; and (vi) as a result of the foregoing, the Company's public statements regarding its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

10. As a result of the foregoing, the Securities Class Action was filed against the Company and Defendant Blum on September 17, 2025, in this Court.

11. As a direct and proximate result of the Individual Defendants' misconduct, the Company has incurred significant financial losses, including the cost of defending and potentially paying class-wide damages in the Securities Class Action, as well as additional losses, including reputational harm and loss of goodwill.

12. Moreover, in light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and Defendants' liability in the Securities Class Action, their being beholden to each other, their longstanding

business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of Cytokinetics' Board cannot consider a demand to commence litigation against themselves and the other Individual Defendants on behalf of the Company with the requisite level of disinterestedness and independence. Accordingly, Plaintiff did not make a demand on the Board because, as further detailed herein, demand would be a futile and useless act.

## JURISDICTION AND VENUE

13. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Section 10(b) of the Exchange Act (15. U.S.C. § 78j(b)), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)).

14. Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

15. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

16. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

17. In connection with the acts, conduct, and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

18. Venue is proper in this District pursuant to Section 27(a) of the Exchange Act and 28 U.S.C. § 1391 because Cytokinetics maintains its principal executive offices in this District, Defendants have conducted business in this District, a substantial portion of the acts and omissions alleged herein, including the dissemination of materially false and misleading information, occurred in this District, Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District, and the Securities

Class Action is pending in this District.

## PARTIES

***Plaintiff***

19. Plaintiff is, and has been at all relevant times, a continuous shareholder of Cytokinetics.

***Nominal Defendant***

20. Nominal Defendant Cytokinetics is a Delaware corporation with its principal executive offices located at 350 Oyster Point Boulevard, South San Francisco, California 94080. Cytokinetics' common stock is traded on the NASDAQ Global Select Market ("NASDAQ") under the ticker symbol "CYTK."

***Individual Defendants***

21. Defendant Blum has served as President, Chief Executive Officer ("CEO"), and as a director of the Company since January 2007. According to the proxy statement filed by the Company on Schedule 14A with the SEC on April 10, 2025 (the "2025 Proxy"), Defendant Blum received $14,368,343 in total compensation from the Company during fiscal year 2024.

22. Defendant Bhanji has served as a director of the Company since February 2021. Bhanji also serves as Chair of the Company's Compliance Committee and as a member of the Company's Nominating and Governance Committee and Transactions Committee. According to the 2025 Proxy, Defendant Bhanji received $524,804 in total compensation from the Company during fiscal year 2024.

23. Defendant Costa served as a director of the Company from November 2010 to November 2024. During his time with the Company, Costa served as Chair of the Company's Compensation and Talent Committee and as a member of the Company's Nominating and Governance Committee. According to the 2025 Proxy, Defendant Costa received $542,304 in total compensation from the Company during fiscal year 2024.

24. Defendant Harrington has served as a director of the Company since April 2022. Harrington also serves as a member of the Company's Nominating and Governance Committee

and Science and Technology Committee. According to the 2025 Proxy, Defendant Harrington received $518,137 in total compensation from the Company during fiscal year 2024.

25. Defendant Henderson has served as a director of the Company since February 2009 and as the Chairman of the Board since April 2022. Henderson also serves as Chair of the Company's Nominating and Governance Committee and as a member of the Company's Audit Committee, Science and Technology Committee, and Transactions Committee. According to the 2025 Proxy, Defendant Henderson received $576,054 in total compensation from the Company during fiscal year 2024.

26. Defendant Kaye has served as a director of the Company since May 2016. Kaye also serves as a member of the Company's Audit Committee, Compensation and Talent Committee, Science and Technology Committee, and Transactions Committee. According to the 2025 Proxy, Defendant Kaye received $532,720 in total compensation from the Company during fiscal year 2024.

27. Defendant Landry has served as a director of the Company since February 2025. Landry also serves as a member of the Company's Audit Committee.

28. Defendant Parshall has served as a director of the Company since February 2013. Parshall also serves as Chair of the Company's Audit Committee and Transactions Committee, and as a member of the Company's Compliance Committee. According to the 2025 Proxy, Defendant Parshall received $548,970 in total compensation from the Company during fiscal year 2024.

29. Defendant Smith served as a director of the Company from March 2012 to May 2024. Smith also served as a member of the Company's Audit Committee, Compensation and Talent Committee, and Compliance Committee. According to the 2025 Proxy, Defendant Smith received $37,564 in total compensation from the Company during fiscal year 2024.

30. Defendant Wierenga has served as a director of the Company since February 2011. Wierenga also serves as Chair of the Company's Science and Technology Committee, and as a member of the Company's Compensation and Talent Committee and Nominating and

Governance Committee. According to the 2025 Proxy, Defendant Wierenga received $545,637 in total compensation from the Company during fiscal year 2024.

31. Defendant Wysenski has served as a director of the Company since November 2020. Wysenski also serves as Chair of the Company's Compensation and Talent Committee, and as a member of the Company's Compliance Committee and Transactions Committee. According to the 2025 Proxy, Defendant Wysenski received $538,137 in total compensation from the Company during fiscal year 2024.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

32. By reason of their positions as officers and/or directors of Cytokinetics, and because of their ability to control the business and corporate affairs of Cytokinetics, the Individual Defendants owed Cytokinetics and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Cytokinetics in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Cytokinetics and its shareholders.

33. Each director and officer of the Company owes to Cytokinetics and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

34. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Cytokinetics, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

35. To discharge their duties, the officers and directors of Cytokinetics were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

36. Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the

affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Cytokinetics, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

37. As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

38. To discharge their duties, the officers and directors of Cytokinetics were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Cytokinetics were required to, among other things:

(i) Ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to Cytokinetics' own Code of Ethics and Business Conduct (the "Code of Conduct");

(ii) Conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(iii) Remain informed as to how Cytokinetics conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(iv) Establish and maintain systematic and accurate records and reports of the business and internal affairs of Cytokinetics and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(v) Maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Cytokinetics' operations would comply with all applicable laws and Cytokinetics' financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(vi) Exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(vii) Refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(viii) Examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

39. Each of the Individual Defendants further owed to Cytokinetics and the shareholders the duty of loyalty requiring that each favor Cytokinetics' interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

40. At all times relevant hereto, the Individual Defendants were the agents of each

other and of Cytokinetics and were at all times acting within the course and scope of such agency.

41. Because of their advisory, executive, managerial, and directorial positions with Cytokinetics, each of the Individual Defendants had access to adverse, non-public information about the Company.

42. The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Cytokinetics.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

43. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

44. The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment.

45. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company, purposefully, recklessly, or negligently, to conceal material facts, fail to correct such misrepresentations, and violate applicable laws.

46. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants, who are directors of Cytokinetics, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

47. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the

commission of the wrongdoing complained of herein, each Individual Defendant acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

48. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Cytokinetics and at all times acted within the course and scope of such agency.

**CYTOKINETICS' CODE OF CONDUCT**

49. Cytokinetics' Code of Conduct states that "the Code of Conduct is applicable to all members of our Board of Directors, all Officers, and all employees of Cytokinetics."

50. The Code of Conduct states that its principal purposes are to:

- Promote honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interests between personal and professional relationships;
- Articulate our commitment to ensure our full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files or submits to the U.S. Securities and Exchange Commission, or other regulatory agencies and in other public communications;
- Educate and support compliance with applicable governmental laws, rules and regulations;
- Clarify the procedures and encourage the prompt internal reporting of violations of the Code to appropriate persons of authority within the Company;
- Ensure understanding of our policies and delineate individual accountability for adherence to the Code, and the timely reporting of any violations of the Code to appropriate persons of authority; and
- Embody principles to which all Directors, Officers and employees are expected to adhere and advocate.

51. Under the section titled "Compliance with Laws and High Ethical Business Standards," the Code of Conduct states:

> It is Cytokinetics' expectation that all of its Directors, Officers and employees, wherever located and regardless of function, conduct all activities in accordance with the highest standards of integrity and ethics, and in compliance with the laws, regulations, and written directives in every country, as well as with this *Code of*

> *Ethics and Business Conduct* and all other corporate and local policies. This expectation extends to third parties with whom we may contract to conduct activities on our behalf.

52. Under the section titled "Understanding and Complying with All Laws and Regulatory Requirements," the Code of Conduct states:

> Cytokinetics and every employee, agent and contractor is expected to be familiar with the basic legal requirements that apply to his/her function or service. Cytokinetics policies, guidelines and SOPs have been designed to provide guidance based on existing laws, guidelines and general expectations of conduct. Therefore, every employee must not only abide with legal requirements but also with requirements in Cytokinetics policies and other documents.
>
> As part of Cytokinetics' continuing commitment to corporate compliance, it has adopted a comprehensive Compliance Program as mandated by applicable federal and state laws. Each year, Cytokinetics makes a good faith declaration that its activities comply with its Compliance Program in all material respects.
>
> ***Compliance is everyone's responsibility.***[2]

53. Under the section titled "Honesty with Regulators and Other Government Officials," the Code of Conduct states:

> Cytokinetics is subject to many domestic and international laws, regulations and guidelines. Particular care must be taken to ensure that no inaccurate, incomplete, or misleading reports, certifications, claims or statements are made to any government agency or official. When dealing with government officials and employees, Cytokinetics employees and their related parties should avoid even the appearance of impropriety. Any activity, anywhere in the world, that could be perceived as an attempt to improperly influence or mislead government officials to obtain favorable treatment or for any other purpose is strictly prohibited. Perceived local customs or common practices are not bases for permissible activity.

54. Under the section titled "Public Disclosure and Communications," the Code of Conduct states, in relevant part:

> We are committed to full, fair, accurate, timely and understandable disclosure in reports and documents we file with or submit to, the U.S. Securities and Exchange Commission and in other public communications, including press releases, issued on our behalf.
>
> In support of this commitment, Directors, Officers and all employees (a) must follow Cytokinetics' Corporate Disclosure/Regulation FD Policy, (b) must

---

[2] Emphasis in original. Unless otherwise indicated, all emphasis is added.

maintain complete and accurate records, and (c) must not knowingly misrepresent or omit, or cause others to misrepresent or omit, facts about Cytokinetics to others, whether within or outside Cytokinetics, including to Cytokinetics' independent auditors, governmental regulators, self-regulating organizations and other governmental officials, as appropriate. Each officer shall, in relation to his or her area of responsibility, carefully review and critically analyze proposed public disclosures for accuracy and completeness. All such disclosures are managed and monitored by the Disclosure Committee.

It is Company policy to adhere to relevant guidelines for scientific exchange of information. Scientific information disseminated by Cytokinetics, or by others in Cytokinetics' behalf must be truthful and not misleading. It also is Company policy to use medical affairs, and scientific materials that have been approved in accordance with Company procedures.

55. Under the section titled "Conflicts of Interest," the Code of Conduct states:

Conflicts of interest are prohibited. Employees, at all times, must be free from any influence that might conflict with the interests of Cytokinetics.

A conflict of interest may arise any time:

- You allow a personal or outside interest to interfere with or influence the performance of your duties;
- You select or engage in preferential treatment to any party or vendor that may directly or indirectly benefit you or your family members; or
- You make a decision or engage in conduct that is not in the best interest of Cytokinetics.

Therefore, do not become involved in any business dealings:

- That are adverse to the interests of Cytokinetics;
- That create or may create a personal or financial interest or opportunity for you, or your family or friends, or that may cause you to be unable to perform your duties for Cytokinetics impartially;
- That would interfere with or improperly influence your job performance; or
- That are for, or on behalf of, any entity that is a competitor of Cytokinetics.

56. Under the section titled "Trading in Company Stock," the Code of Conduct states:

It is Cytokinetics's policy that no employees may use for personal gain, or for the gain of others, important confidential information that may come to him or her from any source connected in any way with the Company. Such information could concern, for example, sales, dividends, acquisitions, mergers, product development, license agreements or litigation of the Company or a business partner. All employees are required to make every effort to safeguard confidential information, with special attention being paid to important information that may

> affect the securities markets. "Insider trading" is the purchase or sale of a publicly traded security while in possession of important non-public information about the issuer of the security. "Tipping" is communicating such information to anyone who might use it to purchase or sell securities. Both insider trading and tipping are illegal and no employee may engage in either activity. When in doubt, information obtained in your role as an employee of Cytokinetics should be presumed to be important and not public.

57. Under the section titled "Maintenance of Corporate Books, Records, Documents and Accounts," the Code of Conduct states:

> Employees must ensure that all Cytokinetics' records are prepared accurately, truthfully, in a timely manner, and, when applicable, are properly authorized. The making of false or misleading entries in any Cytokinetics' record is strictly prohibited . . . .
>
> Financial activities are to be recorded in compliance with all applicable laws and accounting practices. All employees must cooperate fully with the Finance Department, as well as our independent public accountants, and provide complete and accurate information to them to help ensure that all of Cytokinetics' financial books and records are accurate. No assets should be acquired, and no expenditures or financial commitments should be established unless it is accurately reflected in company records.

## **CYTOKINETICS' AUDIT COMMITTEE CHARTER**

58. According to Cytokinetics' Audit Committee Charter, the purpose of the Audit Committee is to, among other things:

- Assist the Board in oversight and monitoring of (i) the integrity of the Company's financial statements, (ii) the Company's financial reporting process, (iii) the Company's compliance with legal and regulatory requirements under applicable securities law and compliance with the Company's insider trading and 10(b)5-1 guidelines and policies, (iv) the independent auditors' qualifications, independence and performance, (v) the Company's systems of internal accounting and financial controls, and (vi) other areas of current or potential significant risk to the Company's finances;

- Provide the Board with the results of its oversight and monitoring and its recommendations derived therefrom;

- Prepare a report in the Company's annual proxy statement in accordance with the rules of the Securities and Exchange Commission (the "SEC"); and

- Provide to the Board such additional information and materials as it may deem necessary to make the Board aware of significant financial matters or other significant risks to the Company that come to its attention and that require the attention of the Board.

59. Under the section titled “Responsibilities,” the Audit Committee Charter tasks the Audit Committee with the following responsibilities, among others:

- Review the periodic reports prepared by the internal audit function (including consultants performing that function), including the results of the annual testing of internal control over financial reporting that supports management’s report, pursuant to Section 404(a), included in the Annual Report on Form 10-K. Review reports prepared by the independent registered public accounting firm of the scope and the results of the auditors testing of internal control over financial reporting, and the annual report thereon, pursuant to Section 404(b), included in the Annual Report on Form 10-K. Review and discuss with management and the independent registered public accounting firm any major issues arising as to the adequacy of the Company’s internal controls, any actions taken in light of material control deficiencies and the adequacy of disclosures about changes in internal control over financial reporting.

- Reviewing on a continuing basis the adequacy of the Company’s system of internal auditing and financial controls, including meeting periodically with the Company’s management and the independent auditors to review the adequacy of such controls and to review before release the disclosure regarding such system of internal controls required under SEC rules to be contained in the Company’s periodic filings and the attestations or reports by the independent auditors relating to such disclosure; Reviewing and providing guidance with respect to the external audit and the Company’s relationship with its independent auditors by: . . .

  > (vii) Receive and review any disclosure from the Company‘s CEO and CFO made in connection with the certification of the company‘s quarterly and annual reports filed with the SEC of: (a) significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the company‘s ability to record, process, summarize, and report financial data; and (b) any fraud, whether or not material, that involves management or other employees who have a significant role in the company‘s internal controls . . .

- Reviewing the interim financial statements and disclosures under Management’s Discussion and Analysis of Financial Condition and Results of Operations with management and the independent auditors prior to the filing of the Company’s Quarterly Report on Form 10-Q. Also, the Committee shall discuss the results of the quarterly review and any other matters required to be communicated to the Committee by the independent auditors under the standards of the PCAOB and SEC;

- Reviewing with management and the independent auditors the financial statements and disclosures under Management’s Discussion and Analysis of Financial Condition and Results of Operations to be included in the Company’s Annual Report on Form 10-K (or the annual report to stockholders if distributed prior to the filing of Form 10-K) . . .

- Overseeing compliance with the requirements of the SEC for disclosure of the independent auditor's services and Committee members, member qualifications and activities . . .
- Reviewing, in conjunction with counsel, any legal matters that could have a significant impact on the Company's financial statements;
- Providing oversight and review of the Company's management of enterprise risk policies and programs . . .
- Reviewing and approving in advance any proposed related party transactions . . .
- If necessary, instituting special investigations with full access to all books, records, facilities and personnel of the Company . . .
- Providing a report in the Company's proxy statement in accordance with the rules and regulations of the SEC;
- Reviewing compliance with the Company's insider trading guidelines and 10(b)5-1 plans and policy . . .
- Reviewing violations of the Code of Ethics and Business Conduct as they relate to financial matters, insider trading, GXP and other matters set forth in this Charter;
- Periodically review the provision of the Code of Ethics and Business Conduct for matters covered by this Charter;
- Review with management any proposed financial guidance that the Company intends to publicly disseminate and changes to such guidance . . .
- Performing such other functions and to have such powers as may be necessary or appropriate in the efficient and lawful discharge of the foregoing . . . .

## SUBSTANTIVE ALLEGATIONS

***Background***

60. Cytokinetics is a late-stage biopharmaceutical company focused on developing and commercializing muscle activators and muscle inhibitors as potential treatments for diseases where muscle performance is compromised or declining. Cytokinetics' research and activities stem from the Company's knowledge and expertise in the cytoskeleton, a complex biological infrastructure that plays a fundamental role in human cells.

61. Cytokinetics' lead drug candidate is aficamten, an oral, small molecule cardiac myosin inhibitor that is intended as a treatment for oHCM. oHCM is a genetic disease that causes

the heart muscle to become thickened making it harder for the heart to pump blood. Although many people with oHCM may have few, if any, symptoms, oHCM can cause serious symptoms including shortness of breath, chest pain, fainting, life-threatening irregular heartbeats, or sudden death. Aficamten is designed to reduce hypercontractility associated with oHCM, preventing myosin from entering a force producing state and thereby improving blood flow and alleviating symptoms of oHCM.

62. The research and development of aficamten is the cornerstone of Cytokinetics' innovation and the anchor for its portfolio of potential medicines. Therefore, Cytokinetics has sought regulatory approval for the commercialization of aficamten in the United States from the FDA by conducting multiple clinical trials to produce data sufficient to apply for an NDA with the FDA. Of the clinical trials the Company has conducted, one included the Safety, Efficacy, and Quantitative Understanding of Obstruction Impact of Aficamten in HCM ("SEQUOIA-HCM"), a pivotal Phase 3 clinical trial of aficamten in patients with symptomatic oHCM.

***The Individual Defendants' False and Misleading Statements***

63. On December 27, 2023, the Company issued a press release titled "Cytokinetics Announces Positive Results from SEQUOIA-HCM, the Pivotal Phase 3 Clinical Trial of Aficamten in Patients with Obstructive Hypertrophic Cardiomyopathy," (the "December 2023 Press Release"). In the December 2023 Press Release, the Company touted the promising data from the SEQUOIA-HCM test supporting aficamten's regulatory approval stating, in relevant part:

> The results of SEQUOIA-HCM show that treatment with *aficamten* significantly improved exercise capacity compared to placebo, increasing peak oxygen uptake ($pVO_2$) measured by cardiopulmonary exercise testing (CPET) by a least square mean difference (95% CI) of 1.74 (1.04 - 2.44) mL/kg/min (p=0.000002). The treatment effect with *aficamten* was consistent across all prespecified subgroups reflective of patient baseline characteristics and treatment strategies, including patients receiving or not receiving background beta-blocker therapy.
>
> Statistically significant (p<0.0001) and clinically meaningful improvements were also observed in all 10 prespecified secondary endpoints, including Kansas City Cardiomyopathy Questionnaire Clinical Summary Score (KCCQ-CSS) at weeks 12 and 24, the proportion of patients with ≥1 class improvement in New York Heart Association (NYHA) functional class at weeks 12 and 24, change in provoked left

ventricular outflow tract gradient (LVOT-G) and proportion <30 mmHg at weeks 12 and 24, as well as exercise workload and guideline-eligibility for septal reduction therapy.

*Aficamten* was well-tolerated in SEQUOIA-HCM with an adverse event profile comparable to placebo. Treatment emergent serious adverse events occurred in 8 (5.6%) and 13 (9.3%) patients on *aficamten* and placebo, respectively. Core echocardiographic left ventricular ejection fraction (LVEF) was observed to be <50% in 5 patients (3.5%) on *aficamten* compared to 1 patient (0.7%) on placebo. There were no instances of worsening heart failure or treatment interruptions due to low LVEF.

64. On February 27, 2024, the Company issued a press release announcing its fourth quarter results for fiscal year 2023 (the "4Q23 Press Release"). In the 4Q23 Press Release, Defendant Blum was quoted as stating, in relevant part:

We ended 2023 strong with positive results from SEQUOIA-HCM which now propel our company forward to the next stages of planning towards our specialty cardiology business model. . . . As we prepare regulatory submissions for *aficamten,* we are executing on commercial readiness activities while also conducting Phase 3 clinical trials in patients with oHCM and nHCM which we believe may further generate evidence in support of our next-in-class objectives to reach a broader array of patients struggling with hypertrophic cardiomyopathy. With a strong balance sheet enabling ample cash runway and multiple levers to access capital, we are pleased to be turning the page onto the next chapter for Cytokinetics and all stakeholders.

65. The 4Q23 Press Release also detailed the aficamten cardiac muscle program and corporate milestones stating, in relevant part:

***aficamten*** (cardiac myosin inhibitor)

- Announced positive results from SEQUOIA-HCM (Safety, Efficacy, and Quantitative Understanding of Obstruction Impact of *Aficamten* in HCM) in December demonstrating that treatment with *aficamten* significantly improved exercise capacity compared to placebo, increasing peak oxygen uptake ($pVO_2$) measured by cardiopulmonary exercise testing (CPET) by a least square mean difference (95% CI) of 1.74 (1.04 - 2.44) mL/kg/min (p=0.000002). Statistically significant (p<0.0001) and clinically meaningful improvements were also observed in all 10 prespecified secondary endpoints. *Aficamten* was well-tolerated with an adverse event profile comparable to placebo. There were no instances of worsening heart failure or treatment interruptions due to low left ventricular ejection fraction (LVEF) . . .

- Convened meetings in February with the U.S. Food & Drug Administration (FDA) to discuss the topline results of SEQUOIA-HCM and prepare for the New Drug Application (NDA) submission.

- Engaged in commercial readiness activities for *aficamten* including market research with hypertrophic cardiomyopathy (HCM) patients and customer account profiling, and held initial conversations with specialty pharmacies and

patient hub providers.

- Advanced profiling of HCM treatment programs, began development of payor clinical value proposition and continued support of medical education activities at medical conferences . . .

- Published manuscript entitled "Exercise Capacity in Patients with Obstructive Hypertrophic Cardiomyopathy: SEQUOIA-HCM Baseline Characteristics and Study Design" in the *Journal of the American College of Cardiology: Heart Failure* . . .

<u>2024 Corporate Milestones</u>

**Cardiac Muscle Programs**

***aficamten*** (cardiac myosin inhibitor)

- Expect to present primary results from SEQUOIA-HCM at a medical conference in Q2 2024.

- Expect to submit a New Drug Application (NDA) to the FDA in Q3 2024 and a Marketing Authorization Application (MAA) to the European Medicines Agency (EMA) in Q4 2024.

- Complete enrollment of MAPLE-HCM in Q3 2024.

- Continue enrollment of ACACIA-HCM in 2024.

- Continue advancing go-to-market strategies for *aficamten.*

66. On April 8, 2024, the Company filed a proxy statement on Schedule 14A with the SEC (the "2024 Proxy"). The 2024 Proxy assured investors that the Company was sufficiently overseeing risks to the Company, and that the Company had internal controls in place, stating, in relevant part:

> The role of our Board of Directors is to oversee the CEO and other senior management in the competent, lawful and ethical operation of the Company, including management's establishment and implementation of appropriate practices and policies with respect to areas of potentially significant risk to us. Management routinely reports to the Board of Directors regarding any potential areas of significant risk. These reports include discussions of current and new areas of potential operational, legal or financial risk and status reports on risk mitigation programs undertaken by us. The Board of Directors as a whole is responsible for such risk oversight but administers certain of its risk oversight functions through its committees, such as the Audit Committee, the Compensation and Talent Committee, the Nominating and Governance Committee and the Compliance Committee of the Board of Directors (the "Compliance Committee").

67. On May 8, 2024, the Company issued a press release announcing its first quarter results for fiscal year 2024 (the "1Q24 Press Release"). The 1Q24 Press Release included updates

on the status of aficamten stating, in relevant part, "Primary Results and Two Additional Analyses from SEQUOIA-HCM to be Presented in a Late-Breaking Clinical Trial Session at the European Society of Cardiology Heart Failure 2024 Congress."

68. On May 13, 2024, Cytokinetics issued a press release titled "Cytokinetics Announces Primary Results From SEQUOIA-HCM Presented in Late Breaking Clinical Trial Session at the European Society of Cardiology Heart Failure 2024 Congress and Published in the New England Journal of Medicine" (the "May 2024 Press Release"). In the May 2024 Press Release, the Company announced its primary results from the SEQUOIA-HCM Phase 3 trial stating, in relevant part:

> SEQUOIA-HCM enrolled 282 patients with obstructive HCM. The baseline characteristics of patients in SEQUOIA-HCM were well-matched between treatment groups and consistent with a symptomatic patient population that had high resting and post-Valsalva gradients (mean [SD]; 55.1 [29.6] and 83.1 [32.3] mmHg, respectively) reflective of substantial burden of disease. Background therapies consisted of beta-blockers (61.3%), calcium channel blockers (28.7%), and disopyramide (12.8%), with combination background therapies permitted.
>
> ***The results from SEQUOIA-HCM showed that treatment with aficamten for 24 weeks significantly improved exercise capacity compared to placebo, increasing peak oxygen uptake (pVO*** $_2$***) measured by cardiopulmonary exercise testing (CPET) by 1.8 ml/kg/min compared to baseline in patients treated with aficamten versus 0.0 ml/kg/min in patients treated with placebo (least square mean (LSM) difference [95% CI] of 1.74 mL/kg/min [1.04 - 2.44]; p=0.000002) (Figure 1)***. . . .
>
> ***Statistically significant improvements were observed in all 10 prespecified secondary endpoints, with functional and symptomatic improvements occurring within two weeks of initiating treatment with aficamten and sustained throughout the treatment period***. Compared to baseline, at Week 24 patients treated with *aficamten* experienced significant improvements in post-Valsalva left ventricular outflow tract gradient (LVOT-G) with an LSM difference of -50 mmHg (p<0.0001) versus placebo. *Aficamten* also substantially reduced the burden of symptoms compared with placebo, with a significant improvement observed in Kansas City Cardiomyopathy Questionnaire Clinical Summary Score (KCCQ-CSS) (LSM difference = 7 points; p<0.0001) and with 34% of patients experiencing ≥1 class improvement in New York Heart Association (NYHA) Functional Class (p<0.0001) (Figure 3). Treatment with *aficamten* substantially reduced the proportion of patients eligible for septal reduction therapy (SRT). Among those eligible for SRT at baseline, over the duration of 24 weeks of treatment, patients receiving *aficamten* spent 78 fewer days eligible for SRT compared with those treated with placebo (p<0.0001). Additionally, from baseline to Week 24, treatment with *aficamten* reduced NT-proBNP, a biomarker of cardiac wall stress, by 80% relative to placebo (Figure 4). . . .

> ***Aficamten was well-tolerated in SEQUOIA-HCM with an adverse event profile comparable to placebo. Treatment emergent serious adverse events occurred in 5.6% and 9.3% of patients on aficamten and placebo, respectively***. Core echocardiographic left ventricular ejection fraction (LVEF) was observed to be <50% in 5 patients (3.5%) on *aficamten* compared to 1 patient (0.7%) on placebo. One of the 5 patients on *aficamten* with low LVEF had LVEF <40% following infection with COVID-19 but did not interrupt treatment as the site-read LVEF remained greater than 40% and the patient did not have symptoms of heart failure due to systolic dysfunction. Overall, there were no instances of worsening heart failure or treatment interruptions due to low LVEF.

69. On May 22, 2024, the Company published a presentation detailing the conclusions from the SEQUOIA-HCM Phase 3 trial, and the Company's regulatory submissions, which included the following slides:






70. On August 8, 2024, the Company issued a press release announcing its second quarter results for fiscal year 2024 (the "2Q24 Press Release"). In the 2Q24 Press Release, the Company detailed its NDA submission for aficamten stating, in relevant part:

> Participated in a Type B meeting with the U.S. Food and Drug Administration (FDA) to discuss potential strategies related to safety monitoring and risk mitigation for *aficamten* and included a review of how results from SEQUOIA-HCM and intrinsic properties of *aficamten* may inform risk mitigation. The Company expects to propose a distinct risk mitigation approach specific to *aficamten* with the New Drug Application (NDA) for which the rolling submission is underway. The Company is on track to complete the rolling NDA submission for *aficamten* in Q3 2024.

71. On December 2, 2024, the Company issued a press release titled "Cytokinetics Announces FDA Acceptance of New Drug Application for Aficamten for the Treatment of Obstructive Hypertrophic Cardiomyopathy" (the "December 2024 Press Release"). The December 2024 Press Release indicated that "[t]he FDA [had] assigned the [Company's] NDA a standard review with a Prescription Drug User Fee Act ("PDUFA") target action date of September 26, 2025. The FDA is not currently planning to hold an advisory committee meeting to discuss the application."

72. The December 2024 Press Release further quoted Defendant Blum who detailed the NDA acceptance stating, in relevant part:

> The NDA acceptance for *aficamten* by FDA is a significant milestone that moves our company another step closer to hopefully translating our pioneering science to the potential benefit of patients suffering from obstructive HCM. The results from SEQUOIA-HCM, the pivotal Phase 3 clinical trial, which form the foundation of the NDA, demonstrated that *aficamten* has a positive impact on exercise capacity, clinical outcomes, symptom burden and cardiac biomarkers in patients with HCM, with a consistent effect across all prespecified subgroups and a favorable safety and tolerability profile. . . . If approved by FDA, we believe *aficamten* may expand utilization of cardiac myosin inhibitors and become the preferred choice amongst physicians and patients while also anchoring our emerging specialty cardiology franchise arising from Cytokinetics' industry-leading muscle biology directed research.

73. On February 27, 2025, the Company issued a press release announcing its fourth quarter results for fiscal year 2024 (the "4Q24 Press Release"). The 4Q24 Press Release quoted Defendant Blum who discussed the Company's progress regarding the aficamten NDA stating, in relevant part:

> The fourth quarter of 2024 capped off a momentous year for Cytokinetics with progress and achievements across our business. With regulatory submissions on file in the U.S., Europe and China for *aficamten* and regulatory review activities underway, we are approaching a key inflection point, and our commercial readiness activities are on track to support planned launch activities. . . . During recent months, we also started important clinical trials advancing later-stage development programs, setting us up to potentially deliver multiple new medicines to patients over the next several years. With a strong balance sheet and additional access to investment capital, we are well-funded to execute the potential commercial launch of *aficamten* in 2025, while we advance our pipeline and continue investing in research for the benefit of all stakeholders.

74. The 4Q24 Press Release also discussed the Company's NDA for aficamten submitted to the FDA, along with other commercialization updates, stating, in relevant part:

> The U.S. Food & Drug Administration (FDA) accepted our New Drug Application (NDA) for *aficamten*, a next-in-class cardiac myosin inhibitor, for the treatment of obstructive hypertrophic cardiomyopathy (HCM). The NDA was assigned standard review with a Prescription Drug User Fee Act (PDUFA) target action date of September 26, 2025. We are responding to information requests from FDA and preparing for clinical site and other inspections. We expect to participate in a mid-cycle meeting with FDA in March. . . .
>
> - Advance NDA review activities with U.S. FDA to support the potential U.S. approval of *aficamten* in 2H 2025.
> - Advance go-to-market strategies and prepare to commercially launch *aficamten* in the U.S. in 2H 2025, subject to approval by FDA.
> - Continue go-to-market plans in Germany and expand commercial readiness activities in Europe in 2025, in preparation for potential approval by the EMA in 1H 2026.
> - Coordinate with Sanofi to support the potential approval of *aficamten* in China in 2H 2025, pending approval by the NMPA.

75. The statements detailed above in ¶¶ 63-74 were materially false and misleading when made because they failed to disclose materially adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (i) the Company had not completely and properly submitted its aficamten NDA to the FDA; (ii) the Company had chosen to omit REMS from the initial aficamten NDA despite prior discussions with the FDA about safety and risk mitigation; (iii) a subsequent REMS submission would necessitate a delay in the FDA's review of the aficamten NDA; (iv) delays in FDA approval would drive uncertainty in the REMS; (v) the Company failed to maintain adequate internal

controls; and (vi) as a result of the foregoing, the Company's public statements regarding its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

***The Truth Begins to Emerge***

76. The truth began to emerge on March 10, 2025, when the Company filed a Form 8-K with the SEC announcing the Company's intent to provide a regulatory update on its NDA for aficamten at an upcoming investor conference (the "Regulatory Disclosure"). The Regulatory Disclosure included information relating to aficamten, and the FDA's review of the NDA, stating, in relevant part:

> 1. Cytokinetics has completed its midcycle review with the Food and Drug Administration ("FDA") with respect to the New Drug Application ("NDA") for aficamten for the treatment of obstructive hypertrophic cardiomyopathy.
>
> 2. FDA has informed Cytokinetics that it does not plan to convene an advisory committee meeting to review the Company's NDA for aficamten.
>
> 3. We expect the Late Cycle meeting with FDA to occur in June 2025.
>
> We maintain our expectation for a differentiated label and risk mitigation profile for aficamten, if approved by FDA.
>
> As previously stated, the Company does not plan to share detailed updates on its communications with the FDA.

77. On April 10, 2025, the Company filed the 2025 Proxy. The 2025 Proxy assured investors that the Company was sufficiently overseeing risks to the Company, and that the Company had internal controls in place, stating, in relevant part:

> The role of our Board of Directors is to oversee the CEO and other senior management in the competent, lawful and ethical operation of the Company, including management's establishment and implementation of appropriate practices and policies with respect to areas of potentially significant risk to us. Management routinely reports to the Board of Directors regarding potential areas of significant risk. These reports include discussions of current and new areas of potential operational, legal or financial risk and status reports on risk mitigation programs undertaken by us. The Board of Directors as a whole is responsible for such risk oversight but administers certain of its risk oversight functions through its committees, such as the Audit Committee, the Compensation Committee, the Governance Committee and the Compliance Committee of the Board of Directors (the "Compliance Committee").

78. On May 1, 2025, after market close, the Company issued the May 2025 Press

Release. According to the May 2025 Press Release, the FDA "ha[d] extended the Prescription Drug User Fee Act (PDUFA) action date for the New Drug Application (NDA) for *aficamten* for the treatment of patients with obstructive hypertrophic cardiomyopathy (oHCM) to December 26, 2025." The reason for this extension was that the FDA was requiring the Company to "conduct a full review of the company's proposed Risk Evaluation and Mitigation Strategy (REMS)." The May 2025 Press Release further stated, in relevant part:

> Following pre-NDA discussions with FDA in which safety and risk mitigation were discussed, Cytokinetics submitted the NDA for *aficamten* in oHCM without an accompanying REMS, and the FDA accepted the NDA for filing. Recently, during the NDA review, the FDA requested that Cytokinetics submit a REMS, based on the inherent characteristics of *aficamten*, which the company provided. The submission of a REMS has now been determined by FDA to be a Major Amendment to the NDA resulting in a standard three-month extension to the original PDUFA action date. No additional clinical data or studies have been requested of Cytokinetics by FDA.

79. On the same day, May 1, 2025, CGS International issued a report following the news of Cytokinetics' aficamten PDUFA delay. The CGS International report stated, in relevant part:

> Thursday evening, after market close, Cytokinetics announced that the PDUFA for aficamten in obstructive hypertrophic cardiomyopathy (oHCM) was delayed three months to December 26, 2025. Cytokinetics disclosed that they recently submitted a proposed REMS and that they had not included a REMS protocol in the initial NDA submission, with the delay related to the REMS review. Much like the Phase 3 SEQUOIA-HCM data, the FDA decision will now be a Christmas gift for investors. . . .
>
> ***The delay is for review of a major amendment following the submission by Cytokinetics of a proposed REMS protocol, per FDA request***. Recall mavacamten (Camzyos) also had a 3-month PDUFA delay, likely related to determination of the REMS. It is our speculation that the mavacamten delay was related to negotiation of an echo monitoring titration protocol vs a PK titration protocol (as was used in the mavacamten EXPLORER-HCM Phase 3 study). It is unclear to us any specific reason why FDA would need additional time to review the aficamten REMS, though we note the proposed REMS not being in the initial submission for aficamten is puzzling. We anticipate negative investor sentiment on the execution/transparency of the submission, which could bleed through into expectations for the launch, though in our view the delay does not change the likelihood of launch success in any meaningful way.
>
> The delay will drive uncertainty on the REMS, which investors had already started to discount as an advantage for aficamten given the recent label update for mavacamten permitting q6m maintenance cardiac echo and relaxation of DDI verbiage. We still see meaningful difference for aficamten and mavacamten on

> ease-of-use and the likely advantages on the REMS/label for aficamten namely; 1) Faster titration, 2) lack of dose down titration due to Valsalva LVOT-G <20 mmHg, 3) wider permissible echo window, 4) dose reduction on LVEF <50% vs interruption/discontinuation, 5) lack of meaningful DDIs. ***However, the delay will put more emphasis on the REMS review, and we think spur speculation on just how much differentiation there will be and how meaningful it is to clinical utilization***.

80. Additionally, on the same day, UBS published a report cutting Cytokinetics' price target from $47 to $41 and stating, in relevant part:

> We see the FDA's 3-mo PDUFA extension for aficamten as a further concern, especially given that the agency has requested the sponsor to submit a REMS. Cytokinetics PR noted that agency requires additional time to do a full review of proposed REMS. We see this update as increasing the chances of a REMS (even if a simplified one) for aficamten; this could potentially be due to conservative FDA stance around 'class label.'

81. On this news, the Company's stock price declined $5.57 per share, or approximately 13%, to close at $37.35 per share on May 2, 2025.

***The Truth is Fully Revealed***

82. The truth was fully revealed on May 6, 2025, when the Company issued a press release announcing its financial results for the first quarter of fiscal year 2025 (the "1Q25 Press Release"). The 1Q25 Press Release quoted Defendant Blum who discussed the FDA's decision to extend the PDUFA date for the aficamten NDA, stating, in relevant part:

> In the first quarter, we made progress towards commercial readiness and advanced our specialty cardiology pipeline. . . . Recently, our PDUFA date for *aficamten* in obstructive HCM was extended by FDA to provide time to review a REMS submission made at the Agency's request subsequent to the initial NDA filing acceptance. We remain confident in the distinct benefit-risk and pharmaceutic profile of *aficamten*, and our top priority is bringing this potential therapy to patients. This month, we also expect to report topline results from MAPLE-HCM, and we continue conduct of ACACIA-HCM, for which we have now completed enrollment of patients. With a strong balance sheet and prudent attention to capital deployment, we are well positioned to deliver across regulatory, clinical and commercial milestones.

83. On the same day, the Company hosted the 1Q25 Earnings Call. During the 1Q25 Earnings Call, Defendant Blum provided additional details about the FDA's decision to extend the PDUFA date for the aficamten NDA, stating, in relevant part:

> As we disclosed last week, the FDA extended the PDUFA date for the NDA for aficamten for the oHCM to December 26, 2025 to provide additional time to conduct a full review of our proposed revs. And to be clear, we had a series of three

meetings with FDA ahead of our NDA submission for aficamten, during which we discussed a range of topics related to the content of our submission, including safety monitoring and risk mitigation strategies.

These included a top-line meeting to review the results of SEQUOIA-HCM, a pre-NDA meeting to cover specific topics related to our submission, and a type B meeting during which we discussed strategies related to safety monitoring and risk mitigation in support of our NDA submission. Attending all three of these meetings were representatives from the Division of Cardiology and Nephrology as well as representatives from the Division of Risk Management within the Office of Surveillance and Epidemiology of FDA.

As we previously shared, these interactions provided the opportunity to discuss in detail the data supporting the safety and intrinsic pharmaceutic properties of aficamten and how they may inform approaches to manage risk and gain insight into FDA's perspectives on this matter. Given these interactions, we considered it reasonable to propose a distinct risk mitigation approach specific to aficamten and based on labelling and other tools such as voluntary education materials.

However, we understood from FDA that the potential need for REMS would be a focus of the Agency's review. We made the determination to take this approach because under the circumstances we thought it was reasonable given the profile of aficamten. However, as a contingency we developed our distinct REMS proposal and we were well prepared to submit it if necessary during the NDA review. Given the mechanism of aficamten, the FDA requested that we submit a REMS specific to its intrinsic properties, which we promptly provided as we communicated last week.

We recently learned from FDA that our subsequent submission of the REMS constitutes a major amendment to the NDA and will now require a standard three-month extension to the original PDUFA Action Date. To remind you please we discovered and developed aficamten with objective to advance it as a potential next in class cardiac myosin inhibitor. Based on its inherent characteristics, we evaluated it in preclinical and clinical studies to understand how its half-life, its rapid onset, its reversibility, as well as an optimized relationship between PK and PD could enable a unique convenient dosing regimen.

We extensively studied its DDI profile to similarly ensure that it was enabling of a distinct clinical profile to support potential differentiation. We believe the results of our clinical studies including SEQUOIA-HCM and FOREST HCM support a potential label and risk mitigation profile that if approved by FDA will differentiate aficamten. Nothing has changed in that regard and again to confirm, no additional clinical data or studies were requested by FDA.

As we disclosed in an 8-K filing in March, during the first quarter, we completed a mid-cycle review with FDA. During the meeting, FDA confirmed that the Agency does not plan to convene an advisory committee meeting which is consistent with prior communications to us, and that our late cycle meeting is expected to occur in June.

While the PDUFA extension does delay the potential approval of aficamten, it does not change our confidence in its distinct benefit, risk and pharmaceutic profile, nor does it change our expectation for a potentially differentiated label and risk mitigation profile upon potential approval. Given the FDA review of the NDA is

ongoing, we do not intend to provide further color or detailed updates on our communications with FDA.

84. On this news, the Company's stock price declined $0.93 per share, or approximately 2.7%, to close at $33.04 per share on May 7, 2025.

***Insider Sales***

85. During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendants Blum, Bhanji, Harrington, Henderson, Parshall, and Wierenga sold shares of the Company's common stock while in possession of non-public information concerning the Company's financial condition and business prospects.

86. While the Company's stock price was artificially inflated, Defendant Blum sold 201,618 shares of Cytokinetics common stock, totaling proceeds of approximately $11.1 million. Defendant Blum made the following sales of Cytokinetics stock during the Relevant Period:

| Transaction Date | Number of Shares Sold | Average Price Per Share | Total Transaction |
|---|---|---|---|
| 1/2/2024 | 12,500 | $85.08 | $1,063,500 |
| 1/19/2024 | 12,500 | $81.42 | $1,017,750 |
| 1/31/2024 | 12,500 | $79.57 | $994,625 |
| 6/4/2024 | 22,500 | $48.85 | $1,099,125 |
| 6/17/2024 | 22,500 | $52.60 | $1,183,500 |
| 7/1/2024 | 11,500 | $54.05 | $621,575 |
| 7/10/2024 | 11,500 | $54.29 | $624,335 |
| 8/12/2024 | 11,500 | $55.17 | $634,455 |
| 9/3/2024 | 5,000 | $57.03 | $285,150 |
| 9/30/2024 | 5,000 | $52.14 | $260,700 |
| 10/9/2024 | 5,000 | $55.61 | $278,050 |
| 11/1/2024 | 5,000 | $51.63 | $258,150 |
| 11/18/2024 | 5,000 | $50.55 | $252,750 |
| 12/2/2024 | 5,000 | $50.76 | $253,800 |
| 3/6/2025 | 16,970 | $43.44 | $737,176.80 |
| 3/17/2025 | 12,648 | $44.38 | $561,318.24 |
| 3/31/2025 | 15,000 | $40.75 | $611,250 |
| 4/10/2025 | 5,000 | $36.77 | $183,850 |
| 4/29/2025 | 5,000 | $40.96 | $204,800 |

87. While the Company's stock price was artificially inflated, Defendant Bhanji sold 2,000 shares of Cytokinetics common stock, totaling proceeds of $104,140. Defendant Bhanji made the following sale of Cytokinetics stock during the Relevant Period:

| Transaction Date | Number of Shares | Average Price Per | Total Transaction |
|---|---|---|---|

| | Sold | Share | |
|---|---|---|---|
| 6/10/2024 | 2,000 | $52.07 | $104,140 |

88. While the Company's stock price was artificially inflated, Defendant Harrington sold 2,283 shares of Cytokinetics common stock, totaling proceeds of approximately $108,411. Defendant Harrington made the following sales of Cytokinetics stock during the Relevant Period:

| Transaction Date | Number of Shares Sold | Average Price Per Share | Total Transaction |
|---|---|---|---|
| 6/3/2024 | 1,580 | $48.64 | $76,851.20 |
| 7/5/2024 | 253 | $54.61 | $13,816.33 |
| 4/3/2025 | 450 | $39.43 | $17,743.50 |

89. While the Company's stock price was artificially inflated, Defendant Henderson sold 25,532 shares of Cytokinetics common stock, totaling proceeds of approximately $1.7 million. Defendant Henderson made the following sales of Cytokinetics stock during the Relevant Period:

| Transaction Date | Number of Shares Sold | Average Price Per Share | Total Transaction |
|---|---|---|---|
| 1/12/2024 | 5,000 | $85.14 | $425,700 |
| 2/14/2024 | 5,000 | $76.48 | $382,400 |
| 4/25/2024 | 10,562 | $64.54 | $681,671.48 |
| 12/11/2024 | 1,780 | $50.42 | $89,747.60 |
| 4/15/2025 | 3,190 | $38.66 | $123,325.40 |

90. While the Company's stock price was artificially inflated, Defendant Parshall sold 25,000 shares of Cytokinetics common stock, totaling proceeds of approximately $1.3 million. Defendant Parshall made the following sales of Cytokinetics stock during the Relevant Period:

| Transaction Date | Number of Shares Sold | Average Price Per Share | Total Transaction |
|---|---|---|---|
| 6/17/2024 | 5,000 | $52.55 | $262,750 |
| 7/1/2024 | 5,000 | $54.22 | $271,100 |
| 7/15/2024 | 5,000 | $55.82 | $279,100 |
| 7/29/2024 | 5,000 | $59.84 | $299,200 |
| 8/12/2024 | 5,000 | $55.20 | $276,000 |

91. While the Company's stock price was artificially inflated, Defendant Wierenga sold 35,194 shares of Cytokinetics common stock, totaling proceeds of approximately $1.7

million. Defendant Wierenga made the following sales of Cytokinetics stock during the Relevant Period:

| Transaction Date | Number of Shares Sold | Average Price Per Share | Total Transaction |
|---|---|---|---|
| 12/27/2023 | 10,000 | $73.60 | $736,000 |
| 10/28/2024 | 4,452 | $52.25 | $232,617 |
| 12/16/2024 | 742 | $48.61 | $36,068.62 |
| 4/21/2025 | 20,000 | $38.46 | $769,200 |

92. As a result of these insider sales, Defendants Blum, Bhanji, Harrington, Henderson, Parshall, and Wierenga were unjustly enriched.

***Harm to the Company***

93. As a direct and proximate result of the Individual Defendants' misconduct, Cytokinetics has lost and expended, and will lose and expend, millions of dollars.

94. Such expenditures include, but are not limited to, the legal fees associated with the Securities Class Action filed against the Company and Defendant Blum, and amounts paid to outside lawyers, accountants, and investigators in connection therewith.

95. Such expenditures also include, but are not limited to, significant compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

96. Furthermore, the Securities Class Action has exposed the Company to potential massive class-wide liability.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

97. Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breach of fiduciary duties by the Individual Defendants.

98. Cytokinetics is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

99. Plaintiff is a current shareholder of Cytokinetics and was a continuous shareholder

of the Company during the period of the Individual Defendants' wrongdoing alleged herein. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

100. A pre-suit demand on the Board of Cytokinetics is futile and, therefore, excused. At the time this action was commenced, the ten-member Board was comprised of Defendants Blum, Bhanji, Harrington, Henderson, Kaye, Landry, Parshall, Wierenga, and Wysenski (the "Director Defendants"), and non-party Jim Daly (together with Director Defendants, the "Directors"). Accordingly, Plaintiff is only required to show that five Directors cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. As set forth below, all of the Directors are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action, including because they face a substantial likelihood of liability, and so demand on the Board to institute this action is not necessary because such a demand would have been a futile act.

101. The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

102. Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

103. Moreover, the Directors willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

104. Defendant Blum is not disinterested or independent and is therefore incapable of considering a demand. In addition to serving as a director, Blum serves as the Company's President and CEO. Thus, as conceded by the 2025 Proxy, Defendant Blum is a non-independent

director. Furthermore, Defendant Blum is named as a defendant, and therefore faces significant personal liability, in the Securities Class Action based on substantially the same wrongdoing as alleged herein, specifically issuing materially false and misleading statements during the Relevant Period.

105. Defendants Parshall, Kaye, Henderson, and Landry serve on the Company's Audit Committee (the "Audit Defendants") and, pursuant to the Audit Committee Charter, were specifically charged with the responsibility to assist the Board in fulfilling its oversight responsibilities related to, *inter alia*, financial accounting and reporting, the underlying internal controls and procedures over financial reporting, and the audits of the financial statements. At all relevant times, however, the Audit Defendants breached their fiduciary duties to the Company by failing to prevent, correct, or inform the Board of the issuance of material misstatements and omissions regarding the Company's business and the adequacy of its internal controls as alleged above. Therefore, the Audit Defendants cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihoods.

106. The Director Defendants, as members of the Board, were and are subject to the Company's Code of Conduct. The Code of Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Directors to also adhere to the Company's standards of business conduct. The Director Defendants violated the Code of Conduct because they knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Director Defendants violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

107. All of the Board's current members derive substantial revenue from the Company, control the Company, and are indebted to each other. These conflicts of interest have precluded the Board's current members from calling into question the Director Defendants' conduct.

108. Moreover, none of the Directors have taken remedial action to redress the conduct

alleged herein.

109. The Directors' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter. As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein. They cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

110. Furthermore, Individual Defendants Blum, Bhanji, Harrington, Henderson, Parshall, and Wierenga received material personal benefits from their insider sales as a result of the Individual Defendants' false and misleading statements alleged herein.

111. The acts complained of herein constitute violations of fiduciary duties owed by Cytokinetics' officers and directors, and these acts are incapable of ratification.

112. Thus, for all of the reasons set forth above, the Directors are unable to consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## COUNT I

**Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)) and Rule 14a-9 (17 C.F.R. § 240.14a-9)**

113. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

114. The Individual Defendants violated Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), and Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated thereunder by the SEC.

115. Section 14(a) of the Exchange Act provides that:

> It shall be unlawful for any person, by use of the mails or by means of instrumentality of interstate commerce or of any facility of a national securities

> exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 781].

15 U.S.C. § 78n(a).

116. Rule 14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading[.]" 17 C.F.R. § 240.14a-9.

117. The Individual Defendants, individually and in concert, disseminated and/or permitted the dissemination of materially false and misleading statements in the 2024 Proxy and 2025 Proxy, which were filed with the SEC. As alleged above, the 2024 Proxy and 2025 Proxy were materially false and misleading because they failed to disclose, *inter alia*, that the Board and management were not properly overseeing risks to the Company, namely risks related to the submission of the aficamten NDA to the FDA.

118. The misrepresentations and omissions in the 2024 Proxy were material to the Company stockholders. Specifically, the misrepresentations and omissions were material to Company stockholders in voting on matters set forth for shareholder determination in the 2024 Proxy, including, but not limited to, the reelection of certain of the Individual Defendants to the Board and the advisory proposal on executive compensation. The materially false and misleading statements contained in the 2024 Proxy misleadingly induced shareholders to vote for the reelection of Defendants Blum and Harrington to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company.

119. The misrepresentations and omissions in the 2025 Proxy were material to the Company stockholders. Specifically, the misrepresentations and omissions were material to Company stockholders in voting on matters set forth for shareholder determination in the 2025 Proxy, including, but not limited to, the reelection of certain of the Individual Defendants to the

Board and the advisory proposal on executive compensation. The materially false and misleading statements contained in the 2025 Proxy misleadingly induced shareholders to vote for the reelection of Defendants Henderson, Parshall, and Bhanji to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company.

120. The Company was damaged as a result of Defendants' material misrepresentations and omissions in the 2024 Proxy and 2025 Proxy.

121. As a result of the Individual Defendants' material misrepresentations and omissions, the Company has sustained significant damages.

122. Plaintiff, on behalf of Cytokinetics, has no adequate remedy at law.

## COUNT II

### Against the Individual Defendants
### For Breach of Fiduciary Duty

123. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

124. The Individual Defendants owed the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

125. The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

126. The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by failing to implement and monitor adequate internal controls over the Company's financial reporting and, as a consequence, issuing or permitting the issuance of materially false and misleading statements in the Company's SEC filings and other public disclosures. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

127. Specifically, the Individual Defendants willfully or recklessly made and/or caused

the Company to make false and/or misleading statements and omissions of material fact that failed to disclose, *inter alia,* that: (i) the Company had not completely and properly submitted its aficamten NDA to the FDA; (ii) the Company had chosen to omit REMS from the initial aficamten NDA despite prior discussions with the FDA about safety and risk mitigation; (iii) a subsequent REMS submission would necessitate a delay in the FDA's review of the aficamten NDA; (iv) delays in FDA approval would drive uncertainty in the REMS; (v) the Company failed to maintain adequate internal controls; and (vi) as a result of the foregoing, the Company's public statements regarding its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

128. In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and omissions of material fact referenced herein.

129. Furthermore, six of the Individual Defendants engaged in insider sales during the Relevant Period while the price of the stock was artificially inflated, netting millions of dollars in proceeds for themselves.

130. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

131. As a direct and proximate result of the Individual Defendants' failure to fulfill their fiduciary obligations, the Company has sustained significant damages.

132. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate

image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Class Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Class Action, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

133. Plaintiff, on behalf of Cytokinetics, has no adequate remedy at law.

## COUNT III

### Against the Individual Defendants for Aiding and Abetting Breach of Fiduciary Duty

134. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

135. By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breach of their fiduciary duties. In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

136. Plaintiff, on behalf of Cytokinetics, has no adequate remedy at law.

## COUNT IV

### Against the Individual Defendants For Unjust Enrichment

137. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

138. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Cytokinetics.

139. The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Cytokinetics that were tied to the performance or artificially inflated valuation of Cytokinetics, or received compensation

that was unjust in light of the Individual Defendants' bad faith conduct.

140. Plaintiff, as a shareholder and a representative of Cytokinetics, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits and other compensation procured by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

141. Plaintiff, on behalf of Cytokinetics, has no adequate remedy at law.

## COUNT V

**Against the Individual Defendants**
**For Waste of Corporate Assets**

142. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

143. The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the Relevant Period. It resulted in continuous, connected, and ongoing harm to the Company.

144. As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying and collecting excessive compensation and bonuses; and (ii) incurring potentially millions of dollars of legal liability and/or legal costs, including defending the Company and Defendant Blum against the Securities Class Action.

145. As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

146. Plaintiff, on behalf Cytokinetics, has no adequate remedy at law.

## COUNT VI

**Against Individual Defendant Blum for Contribution**
**Under Sections 10(b) and 21D of the Exchange Act**

147. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

148. The Company and Individual Defendant Blum are named as defendants in the

Securities Class Action, which asserts claims under federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and Rule 10b-5 promulgated thereunder by the SEC. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole, or in part, due to Individual Defendant Blum's willful and/or reckless violations of his obligations as an officer and director of the Company.

149. Defendant Blum, because of his position of control and authority as an officer and director of the Company, was able to, and did, directly and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts complained of herein and in the Securities Class Action.

150. Accordingly, Defendant Blum is liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

151. As such, the Company is entitled to receive all appropriate contribution or indemnification from Defendants Blum.

152. Plaintiff, on behalf Cytokinetics, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A. Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

B. Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

C. Directing Cytokinetics to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its stockholders from a repeat of the damaging events described herein, including, but not limited to:

- strengthening the Board's supervision of operations and compliance with applicable state and federal laws and regulations;
- strengthening the Company's internal reporting and financial disclosure controls;
- developing and implementing procedures for greater shareholder input into the policies and guidelines of the Board; and
- strengthening the Board's internal operational control functions;

D. Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E. Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury.

Dated: March 9, 2026

**RIGRODSKY LAW, P.A.**

By: */s/ Gina M. Serra*

Gina M. Serra, SBN 361172
1091 N. Palm Canyon Drive, Suite 9
Palm Springs, CA 92262
Telephone: (760) 406-5746
Facsimile: (302) 654-7530
Email: gms@rl-legal.com
*Attorneys for Plaintiff*

**OF COUNSEL:**

**GRABAR LAW OFFICE**
Joshua H. Grabar
One Liberty Place
1650 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (267) 507-6085
Email: jgrabar@grabarlaw.com